



**FILED**
Feb 5, 2013
FEB 0 5 2013

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS THOMAS G BRUTON
EASTERN DIVISION CLERK, U.S DISTRICT COURT

| | |
|---|---|
| SHELDON DROBNY )<br>In the Right of and for the Benefit of )<br>Xformity Technologies, Inc. )<br>Plaintiff, )<br> )<br>v. )<br> )<br>Chris Ball, C. Drew Seale, Michael Shahsavari, )<br>Kenneth Johnson, and Farzin Ferdowsi, )<br> )<br> )<br>Defendants, )<br>and )<br> )<br> )<br>Xformity Technologies, Inc. )<br> )<br>Nominal Defendant )| Case No.<br><br>Verified Derivative Complaint<br><br>JURY TRIAL DEMAND<br><br>13cv926<br>Judge Joan H. Lefkow<br>Magistrate Judge Geraldine Soat Brown |

## SHAREHOLDER VERIFIED DERIVATIVE COMPLAINT

### INTRODUCTION

1.      Plaintiff, derivatively on behalf of nominal defendant Xformity Technologies,Inc,

("XFMY" or the "COMPANY") seeks relief for the damages sustained, and to be

sustained by AMCC, against certain current top executives and its Board of Directorsfor

violations of state and federal law, including their breaches of fiduciary duties, abuse

of control, gross mismanagement, waste of corporate assets and unjust enrichment, and

violations of the Securities and Exchange Act of 1934 (the "Exchange Act"), which

occurred between January 2, 2011 and the present (the "Relevant Period").

1

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interests and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

## PARTIES

### PLAINTIFF

3.     Sheldon Drobny ("Drobny) is the founder of the company and its previous CEO and Chairman.  On September 10, 2004 the SEC was notified of a merger between XFMY and XML-Global Technologies, Inc. a publicly traded company controlled by Drobny.  Drobny, as a result of the merger held beneficial ownership of approximately 27% of the company.

### DEFENDANTS

4.     Chris Ball is the CEO and a director of the company. Drew Seale is the chief technology officer and a director.  Michael Shahsavari is the chairman of the board of directors. Kenneth Johnson is a director of the company.  Farzin Fardowski is a director of the company.

## STATEMENT OF FACTS

5.     On August 13, 2004 XML-Global Technologies, Inc. (XML) entered into an agreement with XFMY to merge into XML, a publicly traded "shell" company controlled by Drobny.  The purpose of the merger was to allow become a public company and use the approximately $3,000,000 of cash held by XML. (Exhibit A)

6.     After the merger, Drobny and his funds held approximately 20% of the XFMY stock.  At the time of the merger, the stock traded at 50 cents/share. (Exhibit B)  XFMY then proceeded to

pay off all its loans which included some of the board members. The non-management board members had advanced funds to the Company to help develop a point of sales accounting and inventory system for quick service restaurants (QSR). These board members were in fact franchisees of many QSRs and had an interest in using the systems for their own QSRs.

7.     The CEO and chairman of the board at the time of merger was replaced by Chris Ball in 2006. The new chairman became defendant Michael Shahsavari. Their goal was to sell the QSR system to major franchises in the QSR business.

8.     Up until 2011 there were some reasonable efforts to obtain contracts with the fast food industry. However, in early 2011 it became clear that the company could not be sustained since the revenue had started to decrease. In addition, a convertible note with a balance of approximately $1,200,000 was coming due in in 2013. Approximately $900,000 of that note is owed to board members and related parties. The loan was secured by the XFMY technology.

9.     In June, 2011 the XFMY stock was trading at 5 cents/share I offered the company a plan to help increase the value of the stock. At the time, the board members were seeking a buyer of the technology to pay off the loan with little left for the remaining shareholders who included approximately 12,000,000 owned by me and our investors.

10.     In a series of emails and letters, I suggested a plan similar to the original merger of XFMY into XML done in 2004. I suggested that XFMY could sell its technology and at the same time acquire a new operating company that was available to me and the other interested shareholders. Such an acquisition could have given XFMY the opportunity to replace the decreasing value of its technology with a fresh start new operating company. (Exhibit C)

11.     This technique has been done successfully for many public companies that have experienced failed or failing operations. In most cases it give a boost to the stock value as it did initially with XML when the stock jumped to 50 cents per share in 2004.

12.     The company ignored my suggestions as the deteriorating operations were becoming apparent to public investors.

13.     On August 1, 2012 XFMY filed 2 8-K reports to the SEC. The first 8-K was a notification that the holders of the convertible debentures were not renewing their note and had given a default notice to the company. (Exhibit D) The 2nd K-1 was the announcement of a definitive agreement to sell the XFMY technology for $1,300,000 to Altametrics XFormity, LLC, a newly formed Delaware limited liability company. Such proceeds would pay of the past due note and accrued interest only. (Exhibit E)

13.     In the last paragraph of the 2nd 8-K it states: "If the Asset Sale is consummated, of which there is no assurance, the Company, as a public entity, intends to identify a new business target to acquire." This is the same strategy Drobny suggested over 1 year before this announcement.

14.     The XFMY stock had plummeted to less .1of a cent/share.  The shares have been trading approximately at that price since August of 2012. (Exhibit F) As a result, the price/share reduction was approximately 5 cents/share causing a market value reduction of based upon 53,756,553 shares outstanding of $2,687,827.  This market value reduction seriously hampers and future merger with another company.

15.     Despite the many telephone calls and emails, the board of directors failed to act in a reasonable manner since they are now planning to do the very same thing that Drobny suggested in June of 2011.  The plan Drobny offered in no way impaired the ultimate sale of the technology and only could have taken advantage of the inherent value of a public company to a new private company seeking to go public.

16.     This intransigence by the board constitutes gross negligence on their part as to the shareholder value of XFMY. As a result, as required by this court, I submitted a demand letter ((Exhibit G) dated January 17, 2013. No action has been taken by the board since receiving the letter.


## COUNT I

### Against All Defendants for Breach of Fiduciary Duty


17.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

18.     The defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

19.      The defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, and good faith supervision.

20.     As a direct result and proximate result of defendants wrongful conduct, the Company suffered damages of at least $2,700,000.


## COUNT II

### Against All Defendants for Gross Mismanagement


4

21.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

22.     By their actions alleged herein. The defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the business of the Company consistent with the operation of a publicly held company.

23.     Defendants had an inherent conflict of interest when negotiating the sale of the company because of their future pending relationship with the acquiring company in that management directors are working for the acquiring company now pending approval of the sale.

24.     Non-management defendants have a conflict due to the fact that they are also creditors of the Company and have notified the Company of their intent to seize the collateral of the company intellectual property.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff demands judgment as follows:

A.     Against all defendants and in favor of the Company damages of $2,700,000.

B.     Extraordinary equitable and injunctive relief as permitted by law, equity and statutory provisions hereunder including resignation of the board of directors and appointment of a new independent board.

C.     Awarding the plaintiff costs of this litigation, and

D.     Granting such other relief as this court deems just and proper.

Respectfully submitted,                           2005 KEATS LANE

                                                  HIGHLAND PARK, IL 60035

                                                  TELEPHONE: 847-579-0770

Sheldon Drobny, *pro, se*

5

EXHIBIT A

**INFORMATION STATEMENT**
**PURSUANT TO RULE 14f-1 UNDER THE**
**SECURITIES EXCHANGE ACT OF 1934**

XML-GLOBAL TECHNOLOGIES, INC.
60 Revere Drive, Suite 725
Northbrook, Illinois 60062
        (847) 562-0700

SEC File Number: 0-23391
Date: September 10, 2004

**Background**

On August13, 2004, XML-Global Technologies, Inc. (the "Company" or "XML") entered into an Agreement and Plan of Merger (the "Agreement" or "Merger Agreement") by and among XML, XML Acquisition Corp, a wholly-owned subsidiary of XML ("XAC"), and XFormity, Inc. ("XFormity"), whereby XAC will be merged with and into XFormity. Upon consummation of the transaction, the shareholders of XFormity will exchange all of their shares of common stock of XFormity for an aggregate of 71,791,939 shares of common stock of the Company and warrants to purchase 23,478,000 shares of the Company's common stock at a purchase price of $0.065 per share. The foregoing numbers do not give effect to the Reverse Split described below which will be effected concurrently with the merger. The shares of common stock issuable to the XFormity shareholders will represent 50% of the total issued and outstanding shares of XML immediately following consummation of the merger. Following the merger, XFormity will be a wholly-owned subsidiary of XML.

Concurrently with the consummation of the merger transaction, XML will effect a reverse stock split on a one-for-four (1-for-4) basis (the "Reverse Split") (every four shares of XML's common stock will be exchanged and reduced to one share). Giving effect to the Reverse Split, the securities issuable to the XFormity shareholders in the merger will consist of an aggregate of approximately 17,947,985 shares of common stock and warrants exercisable to purchase an aggregate of approximately 5,869,500 shares of common stock at an exercise price of $0.26 per share. In addition, XML will change its name to "XFormity Technologies, Inc." The reverse stock split and name change were approved by XML's shareholders at its 2003 annual meeting, which was held on November 14, 2003.

This Information Statement is being furnished to our shareholders pursuant to Rule 14f-1 under the Securities Exchange Act of 1934 by virtue of the fact that the Agreement designates persons to serve as directors of XML after the consummation of the Agreement who will represent a majority of the board following the closing, and they will be elected to serve as directors without a meeting or vote of our shareholders.

Unless otherwise expressly noted, all common share and per share information contained in this Information Statement does not give effect to the Reverse Split.

## About XFormity, Inc.

XFormity, a Texas corporation based in Dallas, designs and implements business intelligence software for large and mid-size companies, with a focus in the quick service restaurant industry. XFormity, along with its strategic partner SEI Information Technology is able to rapidly roll out flexible, extensible solutions to help clients streamline the flow of business information.

## Summary Terms of Merger

The Merger Agreement provides for the consummation of the following principal transactions:

* The merger will result in XFormity becoming a wholly-owned subsidiary of XML;

* The shareholders of XFormity will receive shares of common stock and warrants that will represent 50% of the issued and outstanding shares of common stock and warrants of XML immediately following the merger;

* As a condition to the merger, XML will contribute $500,000 to XFormity for the repayment of shareholder advances;

* As a consequence of the merger, the principal amount of $481,000 and interest thereon from the bridge loan made to XFormity will be converted to an intercompany transaction;

* The common stock and warrants issuable to the XFormity shareholders will be held in escrow subject to the completion of the audited financial statements of XFormity in conformity with federal securities laws;

* Of the common stock issuable to the XFormity shareholders, shares having a market value of $500,000 will be withheld in escrow to cover potential XFormity litigation liabilities;

* Concurrently with the merger, XML will effect a one-for-four (1-for-4) reverse split;

* Concurrently with the merger, XML will change its name to "XFormity Technologies, Inc."

* The Board of Directors and executive officers (except the chief financial officer) of XML will be reconstituted; and the new executive officers will enter into one year employment contracts;

* Subject to completing the merger, XFormity has agreed to pay an investment banking fee to Paradigm Group II, LLC, a principal shareholder of XML, consisting of ten percent (10%) of the pre-merger XFormity shares.

* XML has paid investment banking fees to Paradigm Group, II, LLC, a principal shareholder of XML, in the aggregate amount of $360,000.

We have attached a copy of the Merger Agreement as Appendix I to this Information Statement. The foregoing is a summary of the terms of the Merger Agreement and is qualified in its entirety by reference to the complete Agreement.

**New Management Designated by XFormity**

Under the Agreement that we have entered into with XFormity, as a condition to the merger with XAC we have agreed that Sheldon Drobny will resign as a director and that XFormity and the shareholders of XFormity will designate new directors and executive officers of the Company.

The new directors that have been designated by XFormity to replace our existing directors and their ages are as follows:

Mark Haugejorde, age 48
Michael Shahsavari, age 55
Paul Dwyer, age 44
Shawn Taylor, age 44
Jack Rabin, age 64 and Sergio Nesti, age 39 will remain as directors of the Company.

The new executive officers that have been designated to replace our existing executive officers, their respective positions and their ages are as follows:

Mark Haugejorde - Chairman of the Board and President
C. Drew Seale, age 36 - Chief Technology Officer
Chris Ball, age 39 - Chief Operating Officer

Jack Rabin will remain as chief financial officer of the Company.

## Biographical Information

Listed below is biographical information for each of the foregoing directors and executive officers that have been designated by XFormity, including his or her principal occupation and other business affiliations.

*Mark Haugejorde* is currently Chief Executive Officer for XFormity, Inc., a position he has held since June 2002. From August 1998 to February 2002, Mr. Haugejorde was Chairman of the Board of Directors of VertaPort, Inc., a software company engaged in the development and licensing of integration technology for the golf industry. Mr. Haugejorde attended the University of Houston from 1974 to 1978.

*Michael Shahsavari* has worked in the restaurant industry for the past 25 years as an owner and chief financial officer of franchisees for major brands such as Taco Bell and Pizza Hut. In total, the companies with which Mr. Shahsavari is affiliated employ over 1800 people. Mr. Shahsavari received a Bachelor of Arts (BA) in accounting from the London School of Accountancy.

*Paul Dwyer* is currently Vice President of Commercial Operations for SEI Information Technology, where he has overseen marketing, business development, account management and strategic product planning activities since January 2003. From 1999-2002, Mr. Dwyer was a partner at PricewaterhouseCoopers LLC, where he was involved in strategic planning, large-scale program management, process engineering, change management and software engineering, implementation and operation. In addition, Mr. Dwyer led PricewaterhouseCooper's effort to define its outsourcing strategy and business plan, and managed the Operate and Software Development practice for the central United States, Canada and Mexico. From 1987 to 1999, Mr. Dwyer was PricewaterhouseCooper's PeopleSoft Global Technology Practice Leader and was a project partner, engagement partner and client service partner for clients ranging from mid-market to Global 100 companies. Mr. Dwyer holds a Bachelor of Arts Degree (BA) in English Literature from Marquette University.

*Shawn Taylor* is currently President, Chief Executive Officer and owner of Family EATS, Inc., a Taco Bell franchisee with 29 stores and employing over 500 employees. Mr. Taylor has been involved in Family EATS, Inc. since 1996. From 1982 to 1987 and from 1991 to 1996, Mr. Taylor was a Manager of Business Consulting for Arthur Andersen & Co., LLP. Mr. Taylor holds a Bachelor of Science Degree (BS) in Accounting from Purdue University.

*C. Drew Seale* has served as XFormity's Chief Technology Officer since June 2002. From September 1999 through May 2002, he worked as the Vice President of Applications Development for VertaPort, Inc., where he was responsible for all technology development. From January 1996 through August 1999, he worked as the Director of Application Architecture for Sea-Land, Inc., a shipping company with over 9,000 employees. Mr. Seale earned a Bachelor

of Science Degree (BS) in advertising from the University of Texas and a Master in Business Administration from Texas Tech University.

*Chris Ball* has served as XFormity's Chief Operations Officer since June 2002. From April 2000 through May 2002, he worked as Vice President, Operations for VertaPort, Inc. From May 1998 through March 2000, he worked as a project management consultant for a division of US Freightways. As a consultant for the US Freightways division, he was responsible for the development of their business-to-business auction solution. Mr. Ball earned a Bachelor of Science Degree (BS) in Aerospace Engineering from California Polytechnic University and a Masters in Business Administration from Texas Christian University.

**Current Directors And Executive Officers Of XML**

Our executive officers and directors are listed in the table below and brief summaries of their business experience and certain other information with respect to them are set forth thereafter.

| Name | Age | Position |
| --- | --- | --- |
| Jack Rabin | 64 | Chief Financial Officer and Secretary |
| Sergio Nesti | 39 | Director* |
| Sheldon Drobny | 58 | Director, Chief Executive Officer and President |

*Member of the Audit Committee

*Jack Rabin* has served as our Chief Financial Officer and Secretary since July 1, 2004. From June 2000 through the present, Mr. Rabin has served as Chief Financial Officer of Paradigm Group II, LLC, an investment and financial consulting organization based in Northbrook, Illinois. From 1998 to June 2000, he served as Chief Financial Officer of a major national underwriting firm.. He received a BS degree in business administration from Roosevelt University in 1961 and his CPA certificate from the University of Illinois.

*Sergio Nesti* has been one of our directors since March 2003. He is currently a consultant to Paradigm Group II, LLC, where he has consulted since January 2002. Mr. Nesti also works at Troux Technologies as a Senior Solution Architect. He worked at Autonomy, Inc., as Technical Consultant and Trainer from January 2002 until January 2003. From January 2000 until December 2001, he worked as an Executive in Technology and Services for Brience, Inc. From January 1999 until March 2000 he worked for Click-n-Done, LLC, as Chief Technology Officer. Mr. Nesti worked at Inverse Network Technology/Visual Networks as Vice President

The audit committee is currently composed of the following director:

Sergio Nesti

The Board of Directors has determined that Mr. Nesti is not "independent" within the meaning of the National Association of Securities Dealers, Inc.'s listing standards. For this purpose, an audit committee member is deemed to be independent if does not have a relationship which, in the opinion of the Company's board of directors, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director.

For part of the fiscal year, Robert Gayton was a member of the audit committee. Mr. Gayton was considered "independent" within the meaning of the national Association of Securities Dealers, Inc.'s listing standards.

The audit committee met on one occasion during fiscal 2003, which meeting was attended by all of its members. During the fiscal year ended June 30, 2004, this committee met three times, which meetings were attended by all of its members. The committee is responsible for accounting and internal control matters. The audit committee:

- reviews with management, the internal auditors and the independent auditors policies and procedures with respect to internal controls;

- reviews significant accounting matters;

- approves the audited financial statements prior to public distribution;

- approves any significant changes in accounting principles or financial reporting practices;

- reviews independent auditor services; and

- recommends to the board of directors the firm of independent auditors to audit our consolidated financial statements.

In addition to its regular activities, the committee is available to meet on all matters relating to the independent accountants, controller or internal auditor whenever a special situation arises.

Our board of directors has not adopted a written charter for the audit committee, but plans to adopt one before the end of the current fiscal year.

*Compensation Advisory Committee*

The compensation advisory committee is currently composed of the following director:

Sergio Nesti

The compensation advisory committee met on two occasions during fiscal 2003, which meeting was attended by all of its members. During the fiscal year ended June 30, 2004, this committee met two times, which meetings were attended by all of its members. The compensation advisory committee:

- recommends to the board of directors the compensation and cash bonus opportunities based on the achievement of objectives set by the compensation advisory committee with respect to our chairman of the board and president, our chief executive officer and the other executive officers;

- administers our compensation plans for the same executives;

- determines equity compensation for all employees;

- reviews and approves the cash compensation and bonus objectives for the executive officers; and

- reviews various matters relating to employee compensation and benefits.

Any transactions between the Company and its officers, directors, principal shareholders, or other affiliates have been and will be on terms no less favorable to the Company than could be obtained from unaffiliated third parties on an arms-length basis and will be approved by a majority of the Company's independent, outside disinterested directors.

*Nomination Process*

Our Board of Directors has not appointed a standing nomination committee and does not intend to do so during the current fiscal year. The board as a whole, which consists currently of three members, has addressed the process of determining director nominees. The board has not adopted a charter to govern the director nomination process.

Of the currently serving three directors, none would be deemed to be independent within the meaning of the National Association of Securities Dealers, Inc.'s listing standards. For this purpose, a director is deemed to be independent if he does not possess any vested interests

related to those of management and does not have any financial, family or other material personal ties to management.

The board of directors has not adopted a policy with regard to the consideration of any director candidates recommended by security holders, since to date the board has not received from any security holder a director nominee recommendation. The board of directors will consider candidates recommended by security holders in the future. Security holders wishing to recommended a director nominee for consideration should contact Mr. Jack Rabin, Chief Financial Officer, at the Company's principal executive offices and provide to Mr. Rabin, in writing, the recommended director nominee's professional resume covering all activities during the past five years, the information required by Item 401 of Regulation SB, and a statement of the reasons why the security holder is making the recommendation. The Company must receive such recommendation before June 30, 2005.

The board of directors believes that any director nominee must possess significant experience in business and/or financial matters as well as a particular interest in the Company's activities.

*Shareholder Communications*

Any shareholder of the Company wishing to communicate to the board of directors may do so by sending written communication to the board of directors to the attention of Mr. Jack Rabin, Chief Financial Officer, at the principal executive offices of the Company. The board of directors will consider any such written communication at its next regularly scheduled meeting.

**Advisory Board**

In February 2000, our Board of Directors authorized the establishment of an Advisory Board whose members consist of persons who possess particular expertise in one or more disciplines that we believe are relevant to our strategic plan, business development and core technologies. Currently, no one is serving on the Advisory Board. The members of the Advisory Board do not exercise or possess any of the authority of members of our Board of Directors, but are merely advisors to our board. Advisory Board members are granted 25,000 options for each year of service.

2. **Remuneration and Executive Compensation**

The following tables and discussion set forth information with respect to all plan and non-plan compensation awarded to, earned by or paid to our chief executive officer ("CEO"), our two past principal executive officers, and the Company's four most highly compensated executive officers other than the CEO or principal executive officers, for all services rendered in all capacities to the Company and its subsidiaries for each of the Company's last three completed fiscal years; provided, however, that no disclosure has been made for any executive officer, other

than the CEO and principal executive officers, whose total annual salary and bonus does not exceed $100,000.

## TABLE 1

## SUMMARY COMPENSATION TABLE

| | | | | | Long Term Compensation | | | |
| | Annual Compensation | | | | Awards | | Payouts | |
| Name and Principal Position | Year | Salary ($) | Bonus ($) | Other Annual Compen-sation ($) | Restricted Stock Award(s) ($) | Options/ SARs(#) | LTIP Payouts ($) | All Other Compen-sation ($) |
|---|---|---|---|---|---|---|---|---|
| S. Drobny, chief executive officer | 2004 | 0 | -0- | -0- | -0- | -0- | -0- | -0- |
| | 2003 | 0 | -0- | -0- | -0- | -0- | -0- | -0- |
| | 2002 | 0 | -0- | -0- | -0- | -0- | -0- | -0- |
| S. Anderson, former CFO and principal executive officer [1] | 2004 | 100,612 | 25,000 | -0- | -0- | -0- | -0- | -0- |
| | 2003 | 73,606 | -0- | -0- | -0- | 25,000 | -0- | -0- |
| | 2002 | 61,941 | -0- | -0- | -0- | 25,000 | -0- | -0- |
| G. Kupecz, former COO and principal executive officer | 2004 | 33,494 | 30,000 | -0- | -0- | -0- | -0- | -0- |
| | 2003 | 39,394 | 2,250 | -0- | -0- | 2,014,000 | -0- | -0- |
| | 2002 | 0 | -0- | -0- | -0- | -0- | -0- | -0- |